**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

BOBBY JOE HICKS                                                                    PLAINTIFF

v.                                            No. 4:05CV00538 JLH

ARKANSAS DEPARTMENT OF HEALTH AND HUMAN
SERVICES; JOHN SELIG, in his official capacity as Director of
the Arkansas Department of Health and Human Services;
KURT KNICKREHM, individually; ROY KINDLE, individually
and in his official capacity as DCFS Director;
ROSEMARY WHITE, Assistant Director of Community Services
of DCFS, individually and in her official capacity;
TREDA RICE VANCE, in her official capacity as Area Manager
of DCFS; and LEKITA LEE, individually                                           DEFENDANTS

## OPINION AND ORDER

This is an employment discrimination case.  Plaintiff Bobby Joe Hicks brought claims for

retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; disability

discrimination pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*;

violation of his First Amendment right to petition for redress of grievances pursuant to 42 U.S.C.

§ 1983; and violation of his right to petition the government under the Arkansas Constitution

pursuant to the Arkansas Civil Rights Act ("ACRA"), title 16, section 16-23-108 of the Arkansas

Code.  Hicks brings his Title VII and ADA claims against the Arkansas Department of Health and

Human Services ("DHHS") and John Selig, Roy Kindle, Rosemary White, and Treda Rice Vance,

all of whom are DHHS employees, in their official capacities.  Hicks brings his § 1983 and ACRA

claims against Kurt Knickrehm, Roy Kindle, Rosemary White, and Lekita Lee, all of whom are

current or former DHHS employees, in their individual capacities.[1]  The defendants have moved for summary judgment.  For the reasons stated below, this motion is granted in part and denied in part.

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of its motion and identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)*; Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 763 (8th Cir. 2003).  When the moving party has carried its burden under Rule 56(c), the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1985) (quoting FED. R. CIV. P. 56(e)).  The non-moving party sustains this burden by showing that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  When a non-moving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.  In deciding a motion for summary

---

[1]  To the extent that Hicks's complaint could be construed as asserting Title VII and ADA claims against any of the defendants in their individual capacities or § 1983 and ACRA claims against any of the defendants in their official capacities, these claims are dismissed. Hicks abandoned these claims in his response to the defendants' motion for summary judgment. Thus, without objection, summary judgment is granted as to these claims.

judgment, the Court must view the facts and inferences in the light most favorable to the party opposing summary judgment. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001) (citing *Rabuska v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997)). If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied. *Derickson v. Fidelity Life Assoc.*, 77 F.3d 263, 264 (8th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

The Eighth Circuit has said that summary judgment should seldom be granted in discrimination cases where inferences are often the basis of the claim. *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1024 (8th Cir. 2004) (citing *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999)); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000). *But see Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir. 2004) (Arnold, J. dissenting).

## I.

### A.    Hicks's Previous Litigation with DHHS

Hicks began working for DHHS in 1979 as a Family Service Specialist for the Division of Children and Family Services ("DCFS"). He was terminated from this position in 1982 and filed a lawsuit against DHHS in federal court. The court found that Hicks's termination was the result of unlawful discrimination, and Hicks was subsequently reinstated.[2]

In 1986, Hicks was promoted to Columbia County Supervisor, a position involving significant contact with DHHS clients, including abused children. Hicks was terminated from this position in 1989. He thus filed a second lawsuit in 1991 alleging that he was terminated in

---

[2] *Hicks v. Carle*, No. LR-C-82-672 (E.D. Ark. 1984).

retaliation for the 1982 lawsuit.  This second lawsuit was resolved through a Consent Decree under which Hicks was reinstated.  The Consent Decree prohibited "retaliation against Hicks for his prior legal activity" and stated that Hicks would be treated "fairly and equally with respect to the terms, conditions, and privileges of his employment, including compensation, annual evaluations, promotions and transfers."  *Hicks v. Ark. Dep't of Human Servs./Div. of Children and Family Servs.*, No. LR-C-91-135, slip op. at 4 (E.D. Ark. Feb. 5, 1992).

In June 1995, Hicks was arrested for solicitation of a prostitute.  After his arrest, Hicks received a memorandum from his Area Manager, Ester Burton, informing him that he should not have direct contact with any DHHS clients and that an investigation regarding his violation of DHHS conduct standards would ensue.  Hicks then filed a grievance with DHHS, alleging that Burton issued the "no client contact" order in retaliation for Hicks's previous lawsuits and in violation of the Consent Decree.  The record does not contain a response to this grievance.  Hicks was convicted of patronizing a prostitute about a month later, and his conviction was subsequently upheld on appeal.

In August 1996, Rosemary White, who was then Acting Area Manager, sent Hicks a letter informing him that, because of his conviction, he was found to be in violation of DHHS employee conduct standards.  Because of this violation, he was transferred to the position of Area Training Coordinator, a job that did not involve direct client service, effective September 9, 1996.  Hicks admits that he was placed in a position without client contact because of the nature of his criminal conviction and DHHS's duties to its clients, some of whom are sexually abused children.

In the August 1996 letter, White also informed Hicks that he was being suspended without pay for five days as disciplinary action for an instance of misconduct that had occurred over a year

before.  In that instance, Hicks told Burton at a staff meeting that she had given him a "bullshit assignment" and that he would take her to federal court and "eat her like a hog eats slop."

Hicks appealed his job reassignment to the State Employee Grievance Appeal Panel, which upheld his reassignment.  That decision was upheld by Tom Dalton, who was then the Director of DHHS, in February 1997.

Over two years later, in December 1999, Hicks filed a petition for contempt alleging that DHHS had violated the Consent Decree.  Hicks maintained that DHHS's actions in prohibiting him from client contact and reassigning him to the Area Training Coordinator position were taken in retaliation for his previous lawsuits.  The court held, however, that Hicks had not established a causal connection between his prior lawsuits and his reassignment and that DHHS had proffered a legitimate, nondiscriminatory reason for Hicks's reassignment.  *Hicks v. Ark. Dep't of Human Servs.*, No. 4:91CV00135, slip op. at 7-9 (E.D. Ark. Feb. 27, 2001).  The court concluded that DHHS's actions were not motivated or affected by Hicks's prior lawsuits and therefore denied his petition for contempt.  *Id.*

## B.     Hicks's 2004 Termination

Hicks continued his employment as Area Training Coordinator until 2004.  Hicks testified in his deposition that his job duties in this position were "to schedule meetings five or six days a year, notify people to come to the meeting, and make copies for them."  The rest of the time, he "just sat there and looked at the wall" or "[r]ead books."  He testified, however, that he was never disciplined for poor work performance in this position and never received any unfavorable evaluations from his supervisors. Lekita Lee, who was Hicks's immediate supervisor, contemplated giving Hicks a new project that involved foster-care planning because he needed more work.  This project was not fully developed, however, and no start date for the project had been established.

5

In November 2004, DCFS experienced a staffing shortage and the Director of DCFS, Roy Kindle, requested that all Area Managers conduct an employee audit to identify all staff by position and responsibilities. Kindle testified in his deposition that he did not know that Lee was considering assigning Hicks to a foster-care project and that he selected Hicks for DHHS's Targeted Case Management Project in the Little Rock Central Office based on the information that he gathered from Lee during the employee audit. Kindle also took into consideration the fact that Hicks lived in Little Rock and that a transfer to the Little Rock Central Office would shorten Hicks's daily commute to work. Kindle and White both testified that the Targeted Case Management Project was important to DHHS because it affected funding for the department.

Hicks denies that Kindle and White considered the project valuable. He testified in his affidavit that the job would have involved no judgment calls or exercise of discretion, as he was told that he "would be doing data entry into the computer," which "was merely a clerical duty." Kindle admitted that an employee would need only a high school diploma to perform the job. Hicks also denies that Kindle selected him for this assignment, asserting that it was White's choice. Kindle testified that he selected Hicks for the assignment; White testified that Hicks's selection occurred in a meeting between Kindle, Cecile Blucker, who was in charge of the project, and herself, but that she did not recall whether she or Kindle suggested Hicks for the position.

On November 16, 2004, Lee informed Hicks of his new assignment with the Targeted Case Management Project. Hicks contacted Blucker regarding the assignment and was informed that he would be assisting DHHS and would receive valuable training and job skills. He was instructed to report to Blucker for work on Monday, November 22, 2004.

Hicks did not report to work for his new assignment that day. Instead, Hicks wrote a letter addressed to the Director of DHHS. In this letter, Hicks stated:

6

I do not want this position.

There is no logic in assigning me to this position other than retaliation. . . .

* * *

I am presently recovering from open heart surgery and I have not slept two days straight since I was informed of this change.  I believe sitting there feeding data into a computer eight hour a day would kill me.  I already suffer from postsurgery[3] depression and I am not strong enough to take this.

In case you are going to let them do this, I want your personal guarantee that I will not be fired for filing for a contempt hearing in federal district court.  You agreed in an out-of-court settlement that I would have this right.  The consent decree guarantees that I have the right to expect equal treatment in the terms of my employment.

Mr. Director, have I not paid enough? . . .

* * *

. . . [A] few days ago one of the defendants got a job in my line of supervision and my world is torn all apart again.  For the last four years I have tried to make the best of what little you gave me.  Please don't take any more.  I could never survive it.

The letter reflected that it was copied to "G. Thomas Eisely, [sic] U.S. District Judge."  Judge Eisele presided over Hicks's previous lawsuits against DHHS.  Kurt Knickrehm, who was then the Director of DHHS, forwarded this letter to Kindle.

Hicks's statement that "one of the defendants got a job in my line of supervision" presumably refers to White, who had been a defendant in Hicks's previous contempt proceedings. White supervised Hicks from 1992 to 1994 and from 1996 to 1999.  She was promoted to the position of Assistant Director of Community Services of DCFS in August 2004.  In his affidavit, Hicks stated: "Defendant Rosemary White was not in my chain of command until August, 2004, shortly before I left for heart surgery.  Prior to her coming back into my chain of command, I had always received exceeding standards in evaluation, no conduct violations."

---

[3]  Hicks underwent heart surgery in the fall of 2004.  He does not allege that his heart condition was a factor in the defendants' alleged disability discrimination against him.

7

That same day, November 22, 2004, Hicks saw his physician, Dr. Edwin Barron.  Dr. Barron's notes from that day show Hicks's "Problem/Diagnosis" as "post op," "problems with job," "death in family," and "stress."  Part of Dr. Barron's handwritten notes are illegible.  Some of the legible portions state "honestly feels like he will kill," "<u>really</u> feels like he will kill <u>Rosemary White</u>," and "[p]eople have a vendetta against him."  Dr. Barron referred Hicks to Dr. Thomas Stinnett, a psychiatrist.

That evening Hicks was admitted into Bridgeway Hospital, a residential psychiatric facility. Some of the notes written by Bridgeway staff state that Hicks was depressed, homicidal, and obsessed about "wanting to kill these people on his job."  According to the notes, Hicks reported feeling that people at his job were "out to get him" and that he could not go around some of his coworkers because "he would probably kill them."  Nevertheless, Hicks was released to the care of a family member the next day.  Dr. Stinnett testified in his deposition that he did not believe that Hicks was a danger to others and that he would not have released Hicks otherwise.  Hicks's discharge papers showed his final diagnosis as major depression and adjustment disorder.

Sometime that week, Hicks told Brazil that he spent the night in a psychiatric facility to avoid harming someone in the Little Rock Office.  Brazil did not transmit this information to Kindle at that time.  Brazil testified that she informed Lee of the conversation, but the record is unclear whether Brazil or Lee told anyone else at that time.

On December 1, 2004, Hicks contacted Brazil again to request 40 hours of sick leave.  In support of this request, he faxed a certificate stating that he had been under Dr. Barron's care from November 22, 2004, until "indefinite."  This document was entitled "Certificate to Return to Work/School," but it did not state that Hicks was able to return to work.  None of the documents that Hicks submitted that day indicated what type of medical condition or illness was the basis for his

sick-leave request.  Hicks was given credit, however, for leave under the Family Medical Leave Act ("FMLA") for the week of November 22, 2004, through November 29, 2004.

On December 3, 2004, Kindle wrote to Hicks in response to Hicks's November 22, 2004, letter.  Kindle informed Hicks that an administrative decision had been made to place Hicks on temporary reassignment and that Hicks was to report to Blucker's office on Monday, December 6.  The letter stated that failure to report could result in disciplinary action.  Hicks did not report to Blucker on December 6.

On December 9, 2004, Hicks called Brazil.  During that conversation, Hicks expressed dissatisfaction with his reassignment and Kindle's response to his letter.  According to Brazil, Hicks stated that he would "kill" Kindle if he initiated disciplinary action against him.  Brazil reported this alleged threat to Lee, her supervisor.  Lee in turn reported it to White, who then reported it to Kindle.  White, Kindle, and Brazil all testified that Kindle then called Brazil to confirm that Hicks had said he would kill Kindle. White and Kindle testified that they took the alleged threat seriously.

On December 10, Brazil sent an email addressed to Kindle and copied to White and Lee that stated:

> The following information is provided as you requested.
>
> On or about November 19, 2004, Bobby Hicks came to our office to deliver some training and panel review files.  Bobby stated he had been reassigned to begin working in the Little Rock DCFS office, beginning November 22, 2004, but did not know why and was unclear as to what he would be required to do.
>
> Bobby stated he believed the sudden reassignment was a plot involving Rosemary White to further humiliate him because she had testified against him in court in the past when he was forced to file a lawsuit against DHS.[4]

---

[4] DHHS was previously known as the Arkansas Department of Human Services or "DHS."

> The week of November 21, 2004, Bobby contacted this office to inform that he had
> spent the night in a psychiatric facility. The reason was in order to avoid harming
> someone in the Little Rock Office. Bobby stated he contacted Cecile Blucker
> regarding what his job duties would be and she was very rude to him.
>
> On December 9, 2004, I spoke with Bobby Hicks by telephne [sic]. Bobby stated he
> had written a letter to the Director of DHS regarding his recent job reassignment, but
> that he received a response from you (Roy Kindle). He stated your response
> indicated if he did not comply you would exercise disciplinary action against him.
> Then he stated if you did he would kill you.

At some point after that Kindle decided to terminate Hicks. The defendants assert that the

decision was made on Friday, December 10; Hicks denies this assertion. A letter was sent to Hicks

on December 15, 2004, notifying him of his termination. The defendants have produced no DHHS

documents showing that Hicks was terminated before December 15.

At one point in his deposition Kindle testified, "I really don't know when I terminated Mr.

Hicks." He later testified, however, that he made a final decision to terminate Hicks on December

10, after he had spoken with Brazil and read her email.

White testified that the decision to terminate Hicks had been made two days before the

termination letter was sent, which would have been on December 13, in a meeting between Kindle,

George Weber, who is the Personnel Manager for DCFS, and herself. She also testified that she

knew at that time that Hicks had psychiatric "issues" because she had discussed it with Lee. White

and Lee both testified that when White informed Lee of the decision to terminate Hicks, Lee asked

if Hicks had been contacted for a factual investigation of Brazil's allegations and stated that Hicks

should be allowed to reveal a psychological evaluation on his condition.

On Monday, December 13, Brazil sent another email to Kindle, White, Lee, and another

DHHS employee. This email stated:

> Up until the past two weeks or so, Bobby Hicks has ONLY been soft-spoken,
> courteous, and cooperative. During the years I have been employed in Area VII

DCFS, he has eagerly performed any job instructions provided through me, and in order to gain a clear understanding he would call our office numerous times with various questions. We have had a great working relationship, as well as have become good friends.

The information I revealed regarding Bobby's negative remarks to my Superiors was in confidence and for awareness purposes which I felt to be my moral duty as well as in the best interest of all concerned, especially Bobby. It is my belief that any matters of such delicacy must be approached accordingly in order to avoid escalation. Frankly, I do not believe he even realized what he was saying and I do not have a problem with continuing to work with Bobby. I also now feel it was a mistake on my part to mention it.

In any case, it would be a conflict for me to be implicated as a Reporter, and I request that my name not be used for any actions for or against Bobby. It is my understanding that information is often provided to law enforcement officials by anonymity.

That same day, December 13, Hicks began outpatient treatment with Dr. Stinnett. Dr. Stinnett diagnosed Hicks with Major Depressive Disorder and prescribed him anti-depressant medications. He also recommended that Hicks undergo psychotherapy counseling sessions with Dr. Jerome Die, a psychologist.

The next day, December 14, Hicks requested FMLA leave beginning December 1, 2004. He delivered the request forms and a physician's certification, completed by Dr. Stinnett, to Lee. On the form, Dr. Stinnett listed Hicks's diagnoses as "Depressive Disorder Due to General Medical Condition" and "Coronary Artery Bypass Grafts." Dr. Stinnett further wrote that Hicks's limitations included "work-related stress, short-term memory impairment[, and] inability to effectively communicate." Dr. Stinnett also explained that Hicks had been briefly hospitalized for crisis management and treated with psychotherapy, and that Hicks was referred to outpatient treatment for medication management and psychotherapy. Lee testified that she received the forms but was not aware that Dr. Stinnett was a psychiatrist. The forms did not indicate Dr. Stinnett's medical specialty.

It appears from the record that Hicks's request for FMLA leave was approved. Kindle testified in his deposition that it was approved, but stated that he had not seen the request form before the deposition because such requests go directly from an employee's supervisor, in this case Lee, to the Catastrophic Leave Committee. Brazil testified, however, that according to DHHS procedures Hicks's FMLA leave request would have been sent from Lee to Lee's supervisor, White, for review before going through another channel. White also testified that she had approved at least one of Hicks's prior sick leave requests.

On December 15, 2004, Kindle sent a letter to Hicks notifying Hicks of his termination. Kindle filed a report with the prosecuting attorney's office regarding the alleged death threat.[5] This report is dated December 17, 2004. Kindle also placed the DCFS Central Office on alert and posted Hicks's picture throughout the building, but the record is unclear as to the date or dates on which Kindle took this action.

## C.     DHHS Policies and Procedures

Kindle testified that he fired Hicks because he believed that Hicks had threatened to kill him and that he would have fired any employee who threatened to kill a coworker. The defendants also contend that a former DHHS employee had been terminated for committing the same offense and that this fact influenced Kindles's decision. The record contains no evidence as to any specific former employee being terminated under such circumstances. In his deposition, Kindle testified

---

[5] Hicks objects to this report on the grounds of hearsay. The defendants do not assert that the report proves that Hicks actually threatened to kill Kindle. They offer it to show that Kindle made the report, which the defendants contend is evidence that Kindle believed that Hicks had made such a threat and took the alleged threat seriously. Because the report is not offered "to prove the truth of the matter asserted" in the report, *i.e.*, that Hicks threatened to kill Kindle, it is not hearsay. *See* FED. R. EVID. 801(c) ("'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter asserted.").

only that "[t]he precedent has already been set, and I fired Mr. Hicks."  Lee testified that when

White informed her that Hicks was to be terminated, "[t]here was mention of someone else in DHS

history that may have . . . threatened another employee," so the Hicks "incident was being compared

to another matter."

Hicks denies threatening to "kill" Kindle, contending that he said he would "appeal" if

Kindle took disciplinary action against him.  The parties do not dispute that Hicks was terminated

without being given a hearing or an opportunity to respond to Brazil's allegation.  No one at DHHS

ever asked Hicks if he made the statement.

Hicks contends that his termination in this manner violated DHHS policies and procedures;

DHHS contends that its policies allow for immediate termination of an employee without a hearing

or factual investigation in cases of serious misconduct, including alleged death threats.  DHHS

Policy 1084 entitled "Employee Discipline" provides:

**1084.4.0       All Pertinent Information Should be Gathered**

1084.4.1       When supervisors become aware of possible conduct violations, they
should take steps to gather any information not already known to
them that is necessary to decide if discipline is required and what
level of discipline is appropriate.  (**Note**: See paragraph 1084.6.1)

* * *

**1084.5.0       Temporary Removal from Duty Assignment Pending
Investigation**

1084.5.1       Any employee whose alleged actions or behavior have the potential
to be an immediate or direct threat to public health or safety or might
threaten the safety of a child, client, or co-worker . . . shall be
temporarily removed from his or her duty assignment pending a
review of the allegations by the employee's division
director/designee.  This action shall not be construed as an indication
of wrongdoing by the removed employee, but is imposed to allow
adequate time to conduct an investigation.

1084.5.2       The division director/designee shall determine the length of time
during which the employee will be temporarily removed from duty

13

and shall arrange for the employee to temporarily assume other duties not involving direct contact with children or clients.  A change of work location or residential campus may also be made, if appropriate under the circumstances.  If circumstances require that the employee is to be sent home, the employee will be placed on call, with pay, during normal work hours, and be immediately available to participate in the investigation.

**1084.6.0       Employee Interview**

1084.6.1       An Employee Interview must be conducted prior to disciplinary action.  The supervisor will schedule a formal interview with any employee facing possible disciplinary action and assure the employee knows the purpose of the interview.

1084.6.2       The supervisor and employee will meet within five (5) working days of the supervisor's determination that disciplinary action may be warranted.  The supervisor will provide all known facts to the employee and allow the employee an opportunity to refute the information or identify any extenuating factors.

* * *

1084.6.4       If disciplinary action is warranted, the supervisor must follow guidelines outlined in this policy and DHHS 1085, Minimum Conduct Standards for DHHS Employees.

* * *

1084.6.6       Supervisors must attempt a telephone conference with employees unable or unwilling to meet with them. (Example: the employee has abandoned his/her job, is physically unable to travel, or has been prohibited from entering the workplace.) . . . .

DHHS Policy 1085 entitled "Minimum Conduct Standards for DHS Employees" provides a lengthy list of "Offenses that Violate Minimum Conduct Standards."   This list, contained in section 1085.1.1, includes both minor offenses, such as "[f]ailure to perform assigned duties in an efficient and productive manner" and "use of tobacco products" in prohibited areas, and serious offenses, such as theft, assault, and other criminal conduct.   Immediately following this list of potential conduct violations, Policy 1085 provides:

1085.1.2       The above violations are examples of types of unacceptable conduct.  Unacceptable conduct will result in discipline up to and including immediate termination.   These violations are not all inclusive,

14

> however, and employees who engage in any type of conduct which
> may be injurious to the Department, or which interferes with the
> efficient operations, damages the reputation of DHS, or interferes
> with the Department's ability to serve customers and the public, will
> be subject to disciplinary action up to and including immediate
> termination.

The defendants assert that the "immediate termination" language in Policy 1085 allows them to

terminate an employee without following the procedures set forth in Policy 1084.  White, Kindle,

and Weber all testified that the language of Policy 1084 is mandatory, however, and Weber testified

that 1084 and 1085 "go together."  Lee testified that she knew of no other instance in which an

employee had been terminated without the requisite interview, and she told White and Weber that

Hicks should have been allowed an opportunity to address Brazil's allegations and perhaps provide

a psychological evaluation on his condition.

## II.

As noted above, Hicks brings his Title VII and ADA claims against DHHS and against John

Selig, Roy Kindle, Rosemary White, and Treda Rice Vance in their official capacities.  "[A] suit

against a state official in his or her official capacity is not a suit against the official but rather is a

suit against the official's office."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct.

2304, 2312, 105 L. Ed. 2d 45 (1989).  "As such, it is no different from a suit against the State itself."

*Id.  See also Garcia v. Bd. of Educ. of Socorro Consol. Sch. Dist.*, 777 F.2d 1403, 1407 (10th Cir.

1985) (a suit against members of a state agency acting in their official capacities is a suit against the

agency itself).  Accordingly, White's claims against DHHS and Selig, Kindle, White, and Vance in

their official capacities are analyzed together with respect to both the Title VII and ADA claims.

15

A.      **Hicks's Title VII Retaliation Claim**

Title VII prohibits an employer from retaliating against an employee because he has "made a charge" of unlawful discrimination or has "participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Cross v. Cleaver*, 142 F.3d 1059, 1071 (8th Cir. 1998) (quoting 42 U.S.C. § 2000e-3(a)).  To establish a claim of retaliation in violation of Title VII, a plaintiff must show the following elements: (1) the plaintiff filed a charge of harassment or engaged in other protected activity; (2) the plaintiff's employer subsequently took adverse employment action against him; and (3) the adverse action was causally linked to the plaintiff's protected activity. *Id.* "Once this *prima facie* showing is made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and, if the employer meets that burden, the presumption of retaliation disappears." *Id.* at 1071-72.  If the employer does this, the plaintiff has the burden to identify specific facts in the record showing that the offered reason was merely pretextual and that unlawful retaliation was a motivating factor for the decision. *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 773 (8th Cir. 2003).

The first and second elements are not in dispute: Hicks engaged in protected activity when he filed his previous Title VII lawsuits and he suffered an adverse employment action when the defendants terminated his employment with DHHS.  The defendants argue, however, that Hicks has not shown a causal link between his protected activities and his termination and has therefore failed to establish a *prima facie* case of retaliation.

A close temporal connection between a plaintiff's protected activity and the employer's adverse employment action can suffice to show the "causal connection" necessary to establish a prima facie case of retaliation.  The Eighth Circuit recently explained:

16

> Generally, "the threshold of proof necessary to establish a prima facie case is minimal." *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998). The timing of an adverse employment action in connection with the protected activity "can sometimes establish causation for purpose of establishing a prima facie case." *Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir. 2000).  We have held that periods much longer than . . . three weeks . . . can be used to infer causation.  *See Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir. 1997) (inference of a causal connection was found when there was a six month gap between the adverse action and the protected activity); *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1193 (8th Cir. 1995).  "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Peterson v. Scott County*, 406 F.3d 515, 524 (8th Cir. 2005) (citing *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819-20 (8th Cir. 1998)[)].  In *Peterson*, a two-week gap between termination and protected activity was "close enough to establish causation in a prima facie case." *Id.* at 525.

*Green v. Franklin Nat'l Bank of Minneapolis*, No. 05-2513, 2006 WL 2419171, at *9 (8th Cir. Aug. 23, 2006).  *See also Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 715-16 (8th Cir. 2000) ("The requisite causal connection may be proved circumstantially by showing the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive.").

The defendants assert that Hicks's last "protected activity" under Title VII before his termination was his filing the petition for contempt, which occurred in 1999.  Thus, the defendants argue, "[i]t has been nearly ten years[6] since Hicks last engaged in any protected activity[;] . . . surely ten years, as a matter of law, is too tenuous to prove causation."  The problem with this argument is that Hicks's last protected activity under Title VII was not his 1999 petition for contempt, it was his November 22, 2004, letter to the Director of DHHS.

---

[6] In their brief in support of motion for summary judgment, the defendants mistakenly state that Hicks filed the petition for contempt in 1997.  The defendants assert in their statement of undisputed facts that the petition for contempt was filed on December 10, 1999, the plaintiff has admitted to this fact, and the evidence in the record shows that this is the correct date.

Title VII's prohibition against retaliation is not limited to protection of employees who file suit; it protects activities ranging from filing a complaint to expressing a belief that the employer has engaged in unlawful practices. *Buettner*, 216 F.3d at 714. Writing a letter to one's employer charging that a job reassignment was an attempt to retaliate for previous lawsuits qualifies as a "protected activity." *See Neal v. Ferguson Constr. Co.*, 237 F.3d 1248 (10th Cir. 2001) (letter to employer claiming that reassignment of the employee was an attempt to retaliate for filing EEOC claims was deemed a protected activity).

Hicks's letter regarding his reassignment to the Targeted Case Management Project certainly qualifies as a protected activity under this standard. In the letter, he claimed that he was assigned to the new position in retaliation, referred to his rights under the parties' Consent Decree, and asked for the Director's guarantee that he would "not be fired for filing for a contempt hearing in federal district court." The letter also showed that it was copied to the judge who had presided over Hicks's previous lawsuits against DHHS.

As noted above, he sent this letter on November 22, and he was terminated sometime between December 10 and December 15. The time lapse is therefore not the "ten years" that the defendants assert, but approximately three weeks. This close temporal relationship alone is sufficient to establish the "minimal" threshold of proof necessary for a *prima facie* case. *See Green*, No. 05-2513, 2006 WL 2419171, at *9.

Even if a three-week temporal connection were insufficient to establish the requisite causal connection, however, Hicks has presented other circumstantial evidence that the defendants sought to retaliate against him. *See Wedow v. City of Kansas City Mo.*, 442 F.3d 661, 675 (8th Cir. 2006) (plaintiff may prove causation with circumstantial evidence that justifies an inference of a retaliatory motive, and such evidence must be evaluated along with temporal proximity). The parties do not

18

dispute that Hicks had over 20 years of experience working for DHHS at the time of his job reassignment, including supervisory experience.  He also testified in his affidavit that he holds a Bachelor's degree and has completed approximately 30 hours of graduate work toward a Master's degree.  Yet he was being transferred to a job that, according to Kindle's deposition testimony, could be performed by a person with a high school diploma.  While Kindle and White both testified that the Targeted Case Management Project was important to DHHS, Hicks testified that he was never told that the project was important; rather, he was told that he would be performing clerical duties that did not involve any judgment calls or exercise of discretion.  Hicks's supervisor, Lee, also testified that just before Hicks's reassignment she had planned to have him work on a project involving foster-care planning and that she was surprised when she found out that he was being reassigned.

The defendants also argue, however, that even if Hicks has established a *prima facie* case of retaliation, they have rebutted any presumption of retaliation by stating a legitimate, nondiscriminatory reason for his termination, *i.e.*, that he threatened to kill another employee.  The burden thus shifts to Hicks to show that the defendants' asserted reason was merely a pretext for unlawful retaliation.

Although Hicks denies Brazil's allegation that he threatened to "kill" Kindle, the standard is not whether Hicks actually made the threat, but whether the defendants actually believed that he did.  *Johnson v. AT&T Corp.*, 422 F.3d 756, 762 (8th Cir. 2005) (holding that proper inquiry in plaintiff's wrongful discharge case was not whether plaintiff had actually made bomb threats, but whether defendant honestly believed that he had).  The defendants have presented evidence that they believed Hicks made the threat and that they took it seriously.  Brazil testified that Hicks made the statement, and White, Lee, and Kindle all testified that she transmitted this information to them.

White and Kindle both testified that they took the threat seriously.  Kindle testified that he filed a report with the prosecuting attorney's office, and the defendants have produced a copy of this report. Hicks also concedes that Kindle placed DCFS on alert and had Hicks's picture posted in the Central Office.

The record in this case also contains evidence, however, that the defendants' assertion that they fired Hicks because of the alleged death threat is merely pretextual.  Although Kindle filed a report with the prosecuting attorney's office, that report is dated December 17, 2004 - eight days after the alleged threat and two days after Hicks was notified of his termination.  This delay is inconsistent with the defendants' position that they seriously believed that Hicks might kill Kindle. The defendants stress the fact that Hicks's medical records show that he exhibited homicidal ideation when he was hospitalized in November 2004, but these medical records were not available to the defendants when they decided to terminate Hicks and thus could not have played a role in the termination decision.

More compelling, however, is the fact that the defendants did not follow DHHS policies and procedures when they terminated Hicks without allowing him an opportunity to address Brazil's allegation.  As quoted above, DHHS Policy 1084 expressly states that in cases of  "possible conduct violations," supervisors "must" conduct an employee interview to gather all pertinent information and "allow the employee an opportunity to refute" any allegations against him.  This policy also provides that an employee who may pose a risk to others must be sent home or reassigned, with pay, pending the outcome of the required employee interview.  If an employee is unable to attend an interview because he "has been prohibited from entering the workplace," supervisors "must attempt a telephone conference."  Policy 1085 then states that employees who engage "unacceptable conduct" may be subject to "immediate termination."

20

The defendants assert that this "immediate termination" language allows them to disregard the provisions of Policy 1084 and terminate an employee without an interview in "serious" cases, such as an alleged death threat against another employee.  Neither Policy 1084 nor 1085, however, distinguishes between ordinary cases of alleged misconduct and "serious" cases in which the procedures of 1084 may be skipped to allow for termination of an employee based solely on another employee's accusations.  The defendants' purported interpretation of 1085 would render 1084 a nullity and allow termination of employees without an interview in all cases of alleged misconduct. The testimony of several of the defendants belies this contention.  As noted above, White, Kindle, and Weber all testified that the language of 1084 is mandatory, and Weber testified that 1084 and 1085 "go together."  Lee testified that she knew of no other instance in which an employee had been terminated without the requisite interview and that she told White that Hicks should have been allowed an opportunity to address Brazil's allegations.

The defendants urge that "[a]ny time a state official is forced to make a decision that pits the loss of employment versus the loss of life," they must "value humanity and opt for the latter."  This argument would be valid if the policy required supervisors to meet face-to-face with homicidal employees and retain them in the workplace.  Policy 1084 in no way requires DHHS supervisors to value employment over human life, however, as it expressly allows for telephone interviews with employees who have been barred from the workplace, such as those who may pose a "direct threat" to others.  The defendants do not contend that Hicks could have killed anyone over the telephone or that they could not have mailed his termination letter following a telephone interview.

An employer's failure to follow its own policies and procedures may support an inference of pretext.  *Floyd v. Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 937 (8th Cir. 1999).  Given the evidence that the defendants failed to follow DHHS policies in terminating Hicks

and that Kindle waited eight days to report an alleged death threat against himself, Hicks has at least raised an inference that the defendants' asserted reason for his termination was pretextual, and the circumstantial evidence of retaliatory motivation discussed above is evidence that it was a pretext for unlawful retaliation.

Viewing the evidence in the light most favorable to Hicks, as the Court must in deciding a motion for summary judgment, Hicks has presented evidence sufficient to raise a question of fact as to whether he was terminated in retaliation for his lawsuits and his letter to the Director of DHHS. The defendants' motion for summary judgment as to Hicks's Title VII retaliation claim is therefore denied.

**B.      Hicks's § 1983 and ACRA Retaliation Claims**

Forty-two U.S.C. § 1983 provides that any person acting under color of state law who deprives another of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States shall be liable to the party so injured. One of the rights secured by the United States Constitution is the right "to petition the Government for a redress of grievances." U.S. CONST. amend. I. The ACRA similarly provides protection against "deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution." ARK. CODE ANN. § 16-123-105(a). The Arkansas Constitution guarantees the right "to petition, by address or remonstrance, the government, or any department thereof." ARK. CONST. art. 2, § 4. Hicks brings suit under § 1983 and the ACRA, alleging that the individual capacity defendants violated his right to petition under the United States Constitution and the Arkansas Constitution by terminating him in retaliation for exercising this right. Because the ACRA may construed in accordance with § 1983, ARK. CODE ANN. § 16-123-105(c), Hicks's claims under both statutes are analyzed together below.

22

First Amendment retaliation claims consist of the same elements as Title VII retaliation claims, requiring a plaintiff to prove (1) that he engaged in a protected activity; (2) that the employer took an adverse employment action against him; and (3) that the two situations are causally connected. *Okruhlik v. Univ. of Ark.*, 295 F.3d 872, 878 (8th Cir. 2005). *See also Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n.3 (8th Cir. 2000) ("Claims premised under the Arkansas Civil Rights Act of 1993 are analyzed in the same manner as Title VII claims."). Hicks has met the minimum threshold of evidence as to all three elements.

Hicks engaged in protected activity under both the United States Constitution and the Arkansas Constitution when he wrote the November 22, 2004, letter to the Director of DHHS, which is an arm of the Arkansas state government. In that letter, he "petitioned the government" for redress of his grievance, *i.e.*, his job reassignment and DHHS's alleged retaliation against him. The defendants do not dispute that Hicks was subjected to an adverse employment decision, and, as explained above, he has produced sufficient evidence of a causal connection between his protected activity and subsequent termination to survive summary judgment.

The defendants assert that they are entitled to qualified immunity for Hicks's § 1983 claims, however, "[e]ven if Hicks could demonstrate a violation of his rights." This argument is erroneous; because Hicks has established a factual question as to whether his rights under federal law were violated, the defendants are entitled to qualified immunity only if they can demonstrate that Hicks's Title VII and First Amendment rights are not clearly established. The Eighth Circuit has explained:

> To determine whether an official is entitled to qualified immunity, we ask two questions: (1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional or statutory right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted. [citations omitted]

* * *

23

. . . "[T]he party moving for summary judgment [] "must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions."  *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir. 1992) (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir. 1991)).  As the Supreme Court has instructed, the issue is whether the [government official] "acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed."  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)).

*Henderson v. Munn*, 439 F.3d 497, 501-03 (8th Cir. 2006).

Hicks's rights to be free of unlawful retaliation under Title VII and to petition the government are clearly established rights.  The defendants present no argument to the contrary.  They base their argument instead upon the twin premises that Hicks threatened to kill someone and that the defendants fired him for this reason, not because he had previously sued DHHS and complained of unlawful retaliation.  Thus, they conclude, the defendants' actions were objectively reasonable.  This argument is merely a restatement of the defendants' version of the facts; as explained above, these facts are in dispute.  Because Hicks has raised a genuine issue of material fact regarding the alleged unlawful retaliation, the defendants are not entitled to qualified immunity as to his § 1983 and ACRA claims.  *See Peterson v. Scott County*, 406 F.3d 515, 526 (8th Cir. 2005) (defendants were not entitled to qualified immunity where plaintiff had raised a genuine issue of material fact as to gender discrimination under Title VII); *Hudson v. Norris*, 227 F.3d 1047, 1054 (8th Cir. 2000) (defendants were not entitled to qualified immunity on employee's First Amendment and ACRA claims alleging retaliation against him for his testimony in lawsuit, because reasonable factfinder could find unlawful retaliation by the defendants and reasonable government officials could not have believed that such conduct was lawful).

**C.      Hicks's ADA Claim**

The defendants seek summary judgment as to Hicks's ADA claim on the grounds of both Eleventh Amendment immunity and failure to raise a genuine issue of material fact.  These issues are addressed separately.

**1.      Eleventh Amendment Immunity**

Because the ADA did not validly abrogate the states' Eleventh Amendment immunity, state employers are immune from suit for ADA violations.  *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1004-08 (8th Cir. 1999).  The DHHS, as an arm of the state of Arkansas, therefore is not subject to suit under the ADA.  The defendants' motion for summary judgment as to DHHS on Hicks's ADA claim is therefore granted.

The Eighth Circuit has held, however, that private individuals can sue state officials in their official capacities for prospective injunctive relief under the ADA by using the *Ex parte Young* doctrine.  *Gibson v. Ark. Dep't of Correction*, 265 F.3d 718 (8th Cir. 2001).  An action seeking the reinstatement of a state employee who was improperly terminated is an action for prospective relief and therefore is not barred by the Eleventh Amendment.  *Russell v. Dunston*, 896 F.2d 664, 668 (2d Cir. 1990); *Elliott v. Hinds*, 786 F.2d 298, 301-02 (7th Cir. 1986).

The defendants assert that "Hicks admits that he is not seeking reinstatement" and argue that the holding of *Gibson* does not apply in this case "because Hicks does not seek prospective injunctive relief under his ADA claim."  In his complaint, Hicks requests relief in the form of "an order directing the Plaintiff to be restored to his previous position."  This is a request for reinstatement.  The defendants point to Hicks's deposition, in which he testified: "At this point, I don't think I could perform any of the jobs [at DHHS] right now."  Hicks's mere statement that he could not perform a job a DHHS at the time of his deposition, however, cannot be construed as an

abandonment of his claim for reinstatement. Selig, Kindle, White, and Vance, in their official

capacities, are therefore subject to Hicks's suit for reinstatement under the ADA.

### 2.    The Merits of Hicks's ADA Claim

The framework for analyzing claims of employment discrimination under the ADA is similar

to that used for Title VII. To survive a motion for summary judgment, the plaintiff must initially

present a *prima facie* case. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999).

If the plaintiff does so, "[t]he employer must then rebut the presumption of discrimination by

articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 1135.

If the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's

proferred reason is merely pretextual. *Id.*

To establish a prima facie case of discrimination under the ADA, the plaintiff must show that

"1) he has a disability within the meaning of the ADA, 2) he is qualified to perform the essential

functions of his job, with or without reasonable accommodation, and 3) he suffered an adverse

employment action because of his disability." *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 (8th

Cir. 2003). For purposes of this motion for summary judgment, the defendants do not dispute the

third element, that Hicks suffered an adverse employment action because of his disability. They

dispute both the first and second elements, however, contending that Hicks is neither disabled under

the ADA nor qualified to perform his job.

A person is disabled within the meaning of the ADA under three circumstances: "(A) he is

physically or mentally impaired such that he is substantially limited in one or more major life

activity; (B) he has a record of such an impairment; or (C) he is regarded as having such an

impairment." *Kellogg v. Union Pac. R.R. Co.*, 233 F.3d 1083, 1086-87 (8th Cir. 2000) (citing 42

U.S.C. § 12102(2)).  Hicks alleges that he is disabled due to his depression and that the defendants

terminated him "due to their perception of [him] being disabled or because of his disability."

As explained below, Hicks has failed to show either that his depression substantially limited

his ability to work or that the defendants regarded him as having such a disability.  Because he has

not established the first element of a *prima facie* case of disability discrimination, the Court need

not determine whether Hicks was qualified for his job.

(a)      **Substantially Limited in a Major Life Activity**

The Court first considers whether Hicks has shown that his depression substantially limited

him in the major life activity of working.[7]

> An impairment is "substantially limiting" if it renders an individual unable to
> perform a major life activity which the average person in the general population can
> perform, or if it significantly restricts the condition, manner, or duration under which
> an individual can perform such an activity compart to the general population.  29
> C.F.R. § 1630.2(j)(1)(i)-(ii). . . . Several factors are considered in determining
> whether a person is substantially limited in a major life activity 1) the nature and
> severity of the impairment, 2) its duration or anticipated duration, and 3) its long-
> term impact.  29 C.F.R. § 1630.2(j)(2)(i)-(iii).
> * * *
> To be substantially limited in the life activity of working, a plaintiff must be
> "significantly restricted in the ability to perform either a class of jobs or a broad
> range of jobs in various classes as compared to the average person having
> comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(I).  Inability to
> perform one particular job does not constitute a substantial limitation on working.
> *Id.* Instead, a plaintiff must show that because of his impairment he has suffered a
> significant reduction in meaningful employment opportunities.  *Webb v. Garelick
> Mfg. Co.*, 94 F.3d 484, 488 (8th Cir. 1996).

---

[7] "[T]he Supreme Court has instructed that we analyze only those major life activities
which the plaintiff asserts are limited by the claimed impairment."  *Heisler v. Metro. Council*,
339 F.3d 622, 627 (8th Cir. 2003) (citing *Bragdon v. Abbott*, 524 U.S. 624, 638, 118 S. Ct. 2196,
141 L. Ed. 2d 540 (1998)).  Hicks does not specify in his complaint or other pleadings which of
his major life activities are impaired by his depression, but he asserts that he is unable to work
because of his depression and the evidence presented as to his level of impairment is relevant to
the activity of working.  Working is a major life activity under the ADA.  29 C.F.R. § 1630.2(i).

27

> . . . . To prove disability, plaintiffs must submit more than just evidence of a medical diagnosis of an impairment. [*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S.184, 198, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)]. "Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Id.* at 198, 122 S. Ct. 681 (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567, 199 S. Ct. 2162, 144 L. Ed. 2d 518 (1999)).

*Philip*, 328 F.3d at 1023-25. The proof necessary "is flexible and varies with the specific facts of each case." *Id.* at 1023.

It is undisputed that Hicks has suffered from depression since age 18 and has taken prescription medications for his depression for more than 35 years. The duration of his condition has thus been extremely lengthy. Dr. Stinnett first treated Hicks in November 2004 when Hicks was admitted to Bridgeway Hospital, diagnosing Hicks at that time with Major Depression. Dr. Stinnett testified in his deposition that the symptoms for a depressive disorder include low energy, poor concentration, anxiety or agitation, sleep disturbance, inability to get pleasure out of one's interests, suicidal ideation, and, in very severe cases, psychosis. He then testified that "Major Depression would be a more pervasive collection of those symptoms;" "[i]t's a pervasive, persistent pattern of those symptoms." Dr. Stinnett also testified that Hicks was unable to work because of his depression during late November and early December 2004, the weeks leading up to his termination. As noted above, Hicks had requested and been granted FMLA leave for that time period. When asked about his ability to perform his job functions from October to December 2004, Hicks testified that he could not perform "effectively" during that time. He stated that depression "paralyzes the will" and that his attention span was short. Since his termination, Hicks has applied for and received Social Security Disability benefits. He testified that the Social Security Administration found that his disabling condition began on September 1, 2004.

28

In support of their position that Hicks's depression was not "substantially limiting" within the meaning of the ADA, the defendants point to the undisputed facts that Hicks lives alone and cares for himself and that he satisfactorily performed his job at DHHS for many years before his termination.  At the time of his termination, Hicks admits that he had hoped to take on more job responsibilities through Lee's proposed foster-care planning project.  The defendants point out that, even if Hicks was unable to perform the assignment with the Targeted Case Management Project, such inability does not constitute a substantial limitation in the major life activity of working because one must be limited from performing a broad range or class of jobs, not one particular job. *See Philip*, 328 F.3d at 1024.

The crucial gap in Hicks's case, however, is that he has produced no evidence as to the extent of the limitations that he experienced as a result of his depression.  He testified that his will was "paralyzed" and that his attention span was short, but offered no evidence as to how these problems affected his job performance on a day-to-day basis.  While Hicks has shown that he has had some problems associated with his depression, a showing that depression makes one's life more difficult is not tantamount to a showing of the "substantial limitation" required by the ADA.  *See Heisler*, 339 F.3d at 630 (holding that while the plaintiff "no doubt suffers from major depressive disorder that makes her life difficult," she failed to present evidence that those difficulties rose to the level of substantial impairment necessary to maintain a claim under the ADA).  Although Hicks has testified that he is presently unable to work, the evidence shows that he worked for many years while suffering from depression and became unable to work only during an acute episode of this illness. At the time of his termination, Hicks apparently did not believe that his inability to work was permanent, as he applied for sick leave rather than retirement or disability benefits.  Hicks has

29

therefore failed to establish that he was substantially limited in the major life activity of working for the sustained period of time necessary to qualify as a person with a disability under the ADA.

**(b)    "Regarded as" Having a Disability**

The Court next considers whether, even if Hicks was not substantially limited by his depression, the defendants regarded him as having such a disability.  To establish a "regarded as" claim under the ADA, a plaintiff must show that the employer perceived him as actually disabled. *Kellogg*, 233 F.3d at 1089.  An employer's knowledge that an employee has a physical or mental condition, without more, is insufficient to establish that the employer regarded the employee as disabled.  *Id.*  An employer's request for a mental evaluation of the employee "is not equivalent to treatment of the employee as though []he were substantially impaired," nor is placing the employee on medical leave.  *Cody v. Cigna Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998).  Knowledge of an employee's medical condition in the context of circumstantial evidence that the employer believed that such a condition might render the employee unable to perform his job, however, may support such a claim.  *See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 73 (2d Cir. 1999).

To determine whether the defendants may have regarded Hicks as disabled, the Court must examine the evidence of the defendants' knowledge of Hicks's depression before his termination and their conduct in connection with this knowledge.  One of the material facts in dispute in this case, however, is the date on which Hicks was terminated.  As discussed above, the defendants' position is that Kindle made the decision to terminate Hicks on December 10, 2004; Hicks disputes this contention.  White testified that Hicks's termination was a joint decision made between Kindle, Weber, and herself on December 13.  The parties agree that Hicks's termination letter is dated

30

December 15.  Viewing the evidence in the light most favorable to Hicks, the Court considers the evidence as to the defendants' knowledge of Hicks's depression before December 15, 2004.

On November 22, 2004, Hicks sent a letter to the Director of DHHS stating that he suffered from "post-surgery depression," that he had not slept for two days since learning of his job reassignment, and that he was "not strong enough to take" the reassignment.  This letter was forwarded to Kindle.  Sometime that week, Hicks also told Brazil that he spent the night in a psychiatric facility, but Brazil testified that he did not specifically tell her that he was being treated for a mental illness.  Brazil did not inform Kindle of this conversation, but she did inform Lee.

On December 1, 2004, Hicks contacted Brazil again to request sick leave.  None of the documents that he submitted with this request indicated what type of medical condition or illness he had.  Hicks was given credit for FMLA leave, however, pursuant to this request.

On December 10, Brazil sent an email to Kindle, White, and Lee informing them of the conversation in which Hicks had told her that he spent the night in a psychiatric facility.

White testified that she knew that Hicks had psychiatric "issues" at the time of his termination because she had discussed it with Lee.  White and Lee both testified that, upon being informed of the termination decision, Lee recommended that Hicks be allowed to provide a psychological evaluation on his condition.  The record shows that these discussions took place on or about December 13.

On December 14, 2004, Hicks requested "catastrophic leave" beginning December 1.  With this request, he submitted documentation from Dr. Stinnett showing that he had "Depressive Disorder Due to General Medical Condition" and was limited by "work-related stress, short-term memory impairment[, and] inability to effectively communicate."  This documentation also referred

31

to Hicks's hospitalization for "crisis management" and showed that he was treated with medication and psychotherapy.

This request for medical leave was approved, but the record is unclear as to who approved it or saw the forms before Hicks's termination letter was sent on December 15.  Lee testified that she received these documents but was not aware that Dr. Stinnett was a psychiatrist.  Kindle testified that he did not see the forms until his deposition, which was long after Hicks's termination.  The record is unclear as to whether White saw the documents before December 15, but contains evidence that she may have had to approve such a request for medical leave as Hicks's supervisor.

In support of their position that they did not perceive Hicks as unable to perform his job at the time of his termination, the defendants point to evidence in the record showing that nothing in Hicks's work history reflected an inability to work and that they fully expected that Hicks would be able to perform his new job assignment.  They also point to Lee's testimony that she had planned to give Hicks additional job responsibilities.  Lee's plans to give Hicks additional job responsibilities and the defendants' decision to reassign him to the Targeted Case Management Project, however, all occurred before they had received the information as to Hicks's psychiatric problems.  The issue is whether they still believed that he could perform his job duties after learning that he had a psychiatric condition.  The record contains no direct evidence that they did not, and the only circumstantial evidence is the close temporal connection between Hicks's request for "catastrophic leave" for his depression and his termination letter the next day.

This connection, without more, is insufficient to establish that the defendants regarded Hicks as disabled.  The documentation that Hicks had submitted as to his psychiatric condition when requesting medical leave was very general and vague.  Nothing in that documentation would compel the conclusion that Hicks was disabled as a result of his depression.  The only evidence that any of

32

the defendants gave any thought to Hicks's psychiatric condition is Lee's testimony that she suggested that Hicks be allowed to submit a psychological evaluation and White's testimony that she knew that he had psychiatric "issues."  As noted above, the mere knowledge that an employee has a psychological condition, even coupled with a request for a mental evaluation, does not establish that the employer regarded the employee as "substantially impaired."  *See Cody*, 139 F.3d at 599.  Nothing in Lee or White's testimony suggests that they believed that Hicks was unable to do his assigned job.

Because Hicks has not established a genuine issue of material fact as to whether he was substantially limited in a major life activity or regarded as such by the defendants, he has not shown that he was disabled within the meaning of the ADA at the time of his termination.  The defendants' motion for summary judgment as to Hicks's ADA claim is therefore granted.

### Conclusion

Hicks has produced evidence sufficient to raise a genuine issue of material fact as to whether he was terminated in retaliation for engaging in protected activities under Title VII, the First Amendment, and the Arkansas Constitution.  The defendants' motion for summary judgment (Docket # 35) is therefore denied as to Hicks's claims under Title VII, 42 U.S.C. § 1983, and the ACRA.  Hicks has failed to establish that he was disabled within the meaning of the ADA, however, and summary judgment is therefore granted as to Hicks's ADA claim.

IT IS SO ORDERED this 5th day of September, 2006.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

33